COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-354-CV

 

 

IN THE INTEREST OF Z.J.L. AND X.T.L., 

CHILDREN

 

                                                       ------------

 

              FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                     MEMORANDUM OPINION[1]

 

                                                       ------------








Appellant
N.L. appeals from the termination of her parental rights to her sons Z.J.L.,
born September 7, 2005, and X.T.L., born July 9, 2007.  The trial court found by clear and convincing
evidence that Appellant had (1) knowingly placed or knowingly allowed the
children to remain in conditions or surroundings that endanger their physical
or emotional well‑being and (2) engaged in conduct or knowingly placed
the children with persons who engaged in conduct that endangers the children=s
physical or emotional well‑being.[2]  The trial court also found that termination
of the parent‑child relationship would be in the children=s
best interest.[3]  In five points, Appellant challenges the
legal and factual sufficiency of the evidence supporting the trial court=s
endangerment findings and the factual sufficiency of the evidence supporting
the best interest finding.  Because we
hold that the evidence is legally and factually sufficient to support the
endangerment findings and factually sufficient to support the best interest
finding, we affirm the trial court=s
judgment.

As
we have explained in a similar case,

Endangerment means to expose to loss or
injury, to jeopardize.  The trial court
may order termination of the parent-child relationship if it finds by clear and
convincing evidence that the parent has knowingly placed or knowingly allowed
the child to remain in conditions or surroundings that endanger the physical or
emotional well-being of the child.  Under
subsection (D), it is necessary to examine evidence related to the environment
of the child to determine if the environment was the source of endangerment to
the child=s physical or
emotional well-being.  Conduct of a
parent in the home can create an environment that endangers the physical and
emotional well-being of a child.

 

.
. . Under subsection (E), the relevant inquiry is whether evidence exists that
the endangerment of the child=s physical or
emotional well-being was the direct result of the parent=s conduct, including
acts, omissions, and failures to act. 
Termination under subsection (E) must be based on more than a single act
or omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.

 








To
support a finding of endangerment, the parent=s
conduct does not necessarily have to be directed at the child, and the child is
not required to suffer injury.  The
specific danger to the child=s
well-being may be inferred from parental misconduct alone, and to determine
whether termination is necessary, courts may look to parental conduct both
before and after the child=s
birth. . . .  A parent=s
decision to engage in illegal drug use during the pendency of a termination
suit, when the parent is at risk of losing a child, supports a finding that the
parent engaged in conduct that endangered the child=s
physical or emotional well-being.  Thus,
parental and caregiver illegal drug use supports the conclusion that the
children=s
surroundings endanger their physical or emotional well-being.  A factfinder may also reasonably infer from a
parent=s
failure to attend scheduled drug screenings that the parent was avoiding
testing because the parent was using drugs. 
As a general rule, conduct that subjects a child to a life of
uncertainty and instability endangers the child=s
physical and emotional well-being.[4]

The
trial court heard the following evidence. 
Appellant, who was twenty-two years old at the time of trial, testified that
she became pregnant with Z.J.L. while she was living with the family of L.H.,
his alleged father.  However, L.H. and
his family relocated to Chicago during her pregnancy.  Appellant lived with A.B., X.T.L.=s alleged
father, and his aunt before and during her second pregnancy.  At first, Z.J.L. lived with them.  But E.L., Appellant=s
mother, demanded that Appellant let Z.J.L. move to E.L.=s
home after two or three months because A.B. was abusive.

Appellant
testified that on a scale measuring abuse from one to ten, with ten being
really bad, A.B. was an eight.  He would
body-slam her, hit her with blow-dryers, and give her black eyes.  Regarding A.B.=s
effect on Z.J.L., Appellant admitted that Z.J.L. had seen A.B. hit her on one
occasion but said that the little boy was not paying attention.  She testified,

Q.      Okay. 
What were those two or three months like during the time when [Z.J.L.]
was there?

 








A.      There were signs, but, you know, you can=t really just spot
abuse until the signs start coming up, and the baby was fine.  I mean, [Z.J.L.] was fine, you know.  He wouldn=t mess with him and he wouldn=t do itCwell, one incident,
he did, you know, but he was staying with his auntie and [Z.J.L.] and whatever.
 When [A.B.] would hit me, his auntie
would grab [Z.J.L.] and take him in the next room so that he wasn=t sitting there
watching it, and [Z.J.L.] was nine months. 
Eight months.  He was little.

 

.
. . .

 

Q.      . . . . 
So did [A.B.=s aunt] try to
protect [Z.J.L.]?  Well, do you know why
she would take [Z.J.L.] out of the room?

 

A.      She would just hold him because [Z.J.L.]
would be crying, because he would be in my arms and he was like, one time
[A.B.] pulled [Z.J.L.] out of my arms and sat him down and just went for what
he knew on me, but [A.B.=s aunt] had grabbed
him because he would do a lot of crying when all this stuff would be happening.

 

Q.      About the time, when you say he went with
what he knew on you, so we can be clear to the CourtC

 

A.      I mean, like this one incident that I=m really talking
about when he grabbed [Z.J.L.], it was the incident when he was beating me with
a blow dryer in the room.

 

Appellant testified that she
never left Z.J.L. alone with A.B. 
Appellant testified that allowing Z.J.L. to live with her mother back
then was a good decision, that she felt like she was getting him out of a
dangerous situation, and that moving Z.J.L. to her mother=s
home took him out of harm=s way.








But Appellant
remained with A.B., and she testified that he elbowed her in the stomach when
she was pregnant with X.T.L.  Although
she initially indicated that neither she nor A.B. knew she was pregnant at the
time, later in her testimony she testified that the elbowing had happened
shortly after she had told A.B. that she was pregnant.  She testified that after she told A.B. about
the pregnancy, he was still rough with her and that she would consent to sexual
intercourse with him Ato avoid getting a black eye
and stuff.@  It was during this time that Child Protective
Services (CPS) first became directly involved with Appellant as a parent.

In
February 2007, when Appellant was about six months pregnant with X.T.L., she
took Z.J.L. to Cook Children=s
Medical Center to be treated for an ear infection.  Appellant had a black eye, which caused a
staff member to call CPS.  CPS asked
Appellant to temporarily sign over custody of Z.J.L. to E.L., and Appellant
agreed.

Appellant
continued to live with A.B. for about a week after the incident involving the
elbowing and her black eye, until his arrest after a high-speed chase; he
possessed two Ecstasy pills at the time of his arrest.  She testified that he had sold drugs on the
south side of Fort Worth, not in Forest Hill where they lived, and she did not
know if he ever brought drugs home.  But
she testified that he was using drugs. 
After his arrest, A.B. was sent to prison for violating his probation
from a previous drug offense.  About two
weeks after his arrest, Appellant moved out of his aunt=s
home.








From
there Appellant moved in with her mother. 
Then she lived with a friend, Trameka Turner, for four or five
months.  Apparently, Appellant then
returned to her mother=s home.  In July 2008, Appellant and her sons moved
into Women=s
Haven after E.L. allegedly threw a toy truck at Appellant, cutting her
lip.  They stayed there about five
weeks.  Then they stayed with Trameka
again for a brief period before returning to E.L.=s
home. 

On
September 8, 2008, about two weeks after Appellant had returned to E.L.=s
home, the Saginaw police responded to a domestic disturbance call made by
Appellant.  Appellant, Z.J.L., and X.T.L.
had all been living with E.L.  According
to Appellant, on that night, E.L. kicked Appellant and her sons out of her
home.

Kelli
Smith, a CPS investigator, was assigned to Appellant=s
case that night after receiving a call from the Saginaw Police Department.  She was alerted that Appellant, Z.J.L., and
X.T.L. had been kicked out of E.L.=s
home and had no place to go.  Smith
called the Salvation Army to verify that space was available for Appellant and
her sons.  Then Smith made contact with
Appellant, Z.J.L., and X.T.L.  Smith
testified that the boys appeared clean, clothed, and fed and that upon meeting
them, she had no concerns about their physical care.

On
the way to the Salvation Army shelter, Smith discussed with Appellant options
and programs that could help her with housing, employment, daycare,
transportation, and getting assistance. 
But Appellant decided that foster care was the best option at the
time.  Even though Smith told Appellant
that the Texas Department of Family and Protective Services (TDFPS) did not
recommend putting the boys into foster care (as getting them out of foster care
would require a long and arduous process), Appellant did not change her mind
and even put her request in a written affidavit:








I[,] [Appellant,] is [sic] letting my kids go
with CPS until I can get everything I need to be a better mama for them.  [I=m] letting them go because I have worrie
[sic] life[,] and with them[,] it=s more stressful to do what I need to
do.  So I would feel better knowing that
they are safe and are clothed, and fed. 
I am going to do what I need to do so they will have a home to come
to.  And whatever I need to do to see
them and wait for them.

 

Smith testified that
Appellant was not tearful from the time they met, including when she
relinquished her sons, and that she did not appear to have any type of
emotional reaction when filling out the written affidavit.  Smith testified that the only ground for the
removal was Appellant=s refusal to accept parental
responsibility.  Smith also testified
that at the time of the removal, no actual endangerment had occurred that she
knew of, but there was a risk of endangerment.

Appellant
testified that at the time she signed the affidavit, she could not take care of
the children.  She could not Ado
what [she] needed to do as far as a parent for them.@  Appellant testified that she made the decision
not to go to the Salvation Army shelterCand
instead place the boys in foster careCbecause
she felt it was the best decision at the time. 
However, at trial, she no longer thought that allowing them to go into
foster care was a good decision for them, and she noted that if given the
opportunity to make the decision again, she would have chosen to Atake
[her] responsibility by taking care of them.@  When asked whether she thought the boys had
been hurt emotionally by being in foster care, she answered, AI
don=t
know.@








Smith
interviewed Appellant for background information at the time of the
removal.  Appellant told her that the
boys were both behind on their immunizations and that their Medicaid had lapsed
more than three months earlier, and she had not had time to renew it.

Appellant
also told Smith that she had been in foster care as a teenager because her
mother, E.L., had gone to prison. 
Appellant testified that she had been told that she was depressed since
the age of thirteen years.  She stated
that she was diagnosed with depression at the age of fifteen while she was in
the Nexus Recovery Center after she left foster care and again in July 2008,
when she was staying at Women=s
Haven after E.L. had allegedly beaten her. 
Appellant testified that she had been depressed for the last year before
trial and was depressed during trial. 
She last took medication for her depression when she was fifteen.  At the time of trial, Appellant=s
psychological evaluation had not been completed, and she had never gone to
MHMR.

At
trial, Appellant testified about her drug use. 
She stated that she had first tried marijuana when she was sixteen years
old and had also taken Xanax Awhenever
[she] could get hold if it@ at
that age.  She also testified that she
had tried cocaine once when she was nineteen years old and had tried Ecstasy
for the first time at that age.  She
testified that she last used Ecstasy when she was twenty years old.








Appellant
also discussed her recent drug use, consumption of alcohol, and her criminal
history with Smith.  Appellant told Smith
that she had last used marijuana in December 2007 and January 2008, eight to
nine months before relinquishment.  She
testified that she used maybe once a week during that period.

Appellant
also told Smith that she would smoke outside while her children were in the
apartment.  Appellant testified that she
had never smoked marijuana in her mother=s
apartment, on the porch, or even near the apartment but had smoked when she was
walking alone in the complex.  She
testified that she waited about an hour before returning home after smoking,
that she would not then be Ahigh@ but
might be Aa
little buzzed,@
that she and her mother both took care of the children after the smoking
sessions, and that she had no difficulty taking care of them while under the
influence of marijuana.  She testified
that she never used drugs or alcohol in the children=s
presence.

Appellant
told Smith that she was also Adrinking
heavily@ to Aforget
about her problems@ during that time but denied
having a problem with alcohol or drugs. 
Appellant explained at trial that by Adrinking
heavily@ she
meant drinking frequently, as in three days a week instead of one.

At
trial, Appellant admitted to using marijuana in November 2008 and on her
birthday, May 20, 2009, less than two months before the trial began, but she
testified that she did not use drugs from the time she got pregnant with Z.J.L.
until she delivered X.T.L.  Appellant
admitted at trial that she had signed a paper indicating that she had used
drugs while the case was proceeding.








Appellant
was caught stealing diapers and lotion from an Albertson=s
grocery store in 2007 and subsequently spent three days in jail.  However, the time spent in jail was not for
the theft, but for an unpaid assault ticket. 
Appellant testified that she had received the ticket for assaulting
another woman during an altercation that took place on her birthday.  The boys were at Trameka=s house
under the supervision of Trameka=s
relative when Appellant was arrested; E.L. retrieved them that same day.

Appellant
testified that she had dropped out of high school in the eleventh grade and had
not obtained a GED.  Appellant was not
working at the time of her relinquishment of her sons but told Smith that she
had worked at several different fast food restaurants in the past.  Appellant testified that she had not worked
since 2006; her last job was working for Church=s
Chicken in Saginaw, but she quit because she moved.  She also testified that she worked at Ebony=s
Hair Supply and as a receptionist at an income tax preparation business in
2006.  Appellant has relied on financial
support from E.L., other relatives, and friends since 2006 as well as government
aid for the boys.

Obtaining
stable employment, however, was a requirement set forth in the CPS service
plan.  Appellant only sent out five
applications during the approximately ten months before trial began and did
nothing before trial to obtain a GED or gain any additional job training.








Appellant
failed to comply with the family service plan, with the exception of attending
nineteen out of thirty scheduled visits with her children and obtaining a drug
and alcohol assessment.  She attended one
individual counseling session but was ultimately discharged because of her
continued failure to attend.  In answer
to the question, AWhy haven=t
you gone . . . ?@, Appellant responded, ABecause
I didn=t
know where this was going to lead as far as termination or if I get my rights
back, so I didn=t go.@

She
did not attend any parenting classes or get a psychological evaluation.  She did not go to Safe Haven Education
Program.

Appellant
also failed to obtain stable housing. 
She agreed that she had not had stable housing since the children were
born.  In September 2008, after she
relinquished her children, Appellant apparently moved back to E.L.=s
home until the summer of 2009, when she lived with Trameka again for about
two-and-a-half weeks.  When the trial
began, Appellant was living with someone named Bridgett but did not know her
last name.  Appellant stayed with her
about a month and a half.  Appellant
testified that she moved in with her godmother after the trial began and had
been living with her a week before the second day of trial, but she also
testified that she was not living with her godmother.  Appellant testified that if the boys were
returned to her, they could all stay with the godmother until Appellant could Aget
on [her] two feet.@  Appellant admitted that E.L. was living with
her godmother until she too could get her own apartment.








Appellant=s
godmother=s
testimony indicated that Appellant had not been sleeping at her home the past
several nights and that she and her children could stay there, depending on
Appellant=s
actions.  The godmother also testified
that in her opinion, Appellant does not really want the children back; instead,
she just wants them in a stable environment where she can visit as often as she
would like but not have the responsibility of settling down and taking care of
them.

Appellant
testified that if the children were returned, then Afirst
of all,@ she
would move in with Vera Dillard or APeeWee,@ her
mother=s
estranged husband=s aunt whom she had not seen
for about a year before trial.  PeeWee
had told Appellant that she and the boys could live with her Ano
matter how long it takes until [she] gets on [her] feet.@  Then, Appellant planned to go to MHMR and to
find a job.  She also testified that she was
willing and able to provide a safe environment for the children.

When
asked by the children=s attorney ad litem to name
something she had changed in the month before trial to put her in a position to
care for her sons, Appellant answered that she could not recall and did not
know.  But she testified that she loved
them very much, that she wanted them to have a good life, and that they could
have opportunities that she had not had as a child because she Awould
be supportive@;
she Awould
be their mother.@  She admitted that she needed to be mentally
healthy to take good care of her children, that she had not gone to MHMR
despite the advice of her mother, her lawyer, her caseworkers, and her CASA
worker, and that knowing that she needs medication, she nevertheless Akeep[s]
pushing it back.@








She
also admitted that she would need about eight months to get into a position in
which she could raise her children in a safe, stable, and nurturing
environment.

Tonyia
Brown, the CPS caseworker at the time of trial, testified that the boys have
been in the same foster home since the removal. 
She said that the boys are now current on their shots and are physically
healthy, but they have asthma and are allergic to mosquitos.  She also testified that the boys are
developmentally on target, speaking clearly and interacting with their foster
family.  She opined from observing one
visit and reading the case notes that the boys are bonded to both their
grandmother and Appellant.  Brown
testified that the foster parents want to adopt the boys, that she believed
termination was in the boys=
best interest, and that TDFPS would support adoption by the foster parents if
the birth parents= rights were terminated.

Marla
Hogan, the CASA worker, explained why she believes termination is for the best
in this case.  She stated that Appellant
has been unable to maintain and does not currently have stable housing, she has
been unable and unwilling to find and maintain steady employment, she has
failed to complete her service plan, and the children have no viable support
system if they are returned to her.








Applying
the appropriate standard for reviewing the legal sufficiency of the evidence,[5]
we hold that, based upon our review of the record, the evidence is legally
sufficient to support the trial court=s
endangerment findings regarding Appellant under subsections (D) and (E).  Further, applying the appropriate standard
for reviewing the factual sufficiency of the evidence,[6]
we hold that, based upon our review of the record, the evidence is factually
sufficient to support those findings.  We
overrule Appellant=s first, second, third, and
fourth points.

Further
applying the appropriate standard of review,[7]
we hold that the evidence is factually sufficient to support the best interest
finding, and we overrule Appellant=s
fifth point.

Having
overruled all of Appellant=s
points, we affirm the trial court=s
judgment.

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL:  DAUPHINOT, MCCOY, and MEIER, JJ.

 

DELIVERED:  July 1, 2010











[1]See Tex. R. App. P.
47.4.





[2]See Tex. Fam. Code Ann. ' 161.001(1)(D), (E)
(Vernon Supp. 2009).





[3]See id. ' 161.001(2).





[4]In re J.W., No. 02-08-00211-CV,
2009 WL 806865, at *4 (Tex. App.CFort Worth Mar. 26, 2009, no pet.) (mem. op.)
(citations omitted); see also In re J.O.A., 283 S.W.3d 336, 345B46 (Tex. 2009).





[5]See In re J.P.B.,
180 S.W.3d 570, 573B74 (Tex. 2005).





[6]See In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006); In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).





[7]See Tex. Fam. Code Ann. ' 263.307(a), (b)
(Vernon 2008); In re R.R., 209 S.W.3d 112, 116 (Tex. 2006); H.R.M.,
209 S.W.3d at 108; C.H., 89 S.W.3d at 28; Holley v. Adams, 544
S.W.2d 367, 371B72 (Tex. 1976).